Filed 3/27/23  Jin v. Buck Institute for Research on Aging CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHIYING JIN et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>BUCK INSTITUTE FOR RESEARCH ON AGING,<br><br>        Defendant and Appellant. | A164941<br><br>(Marin County<br>Super. Ct. No. CIV2102919) |

Defendant Buck Institute for Research on Aging (defendant or Buck Institute) appeals from an order that denied its motion to compel plaintiffs Shiying Jin and Lei Lei (collectively, plaintiffs) to arbitrate their claims against it.  We affirm.

## BACKGROUND

**The Parties and the General Setting**

Located in Novato, the Buck Institute is an independent research facility focused solely on understanding the connection between aging and chronic disease.  It operates a number of labs and recruits scientists from all over the world to conduct research on "how normal aging contributes to the development of conditions associated with getting older, such as Alzheimer's and Parkinson's disease, cancer, stroke and diabetes."

1

On April 1, 2019, plaintiffs received and accepted a written offer from defendant to work as faculty researchers within its Center for Female Reproductive Longevity and Equality for five years, beginning on July 15, 2019 (referred to herein as the April 1, 2019 employment contract). Lei was hired to work as an associate professor and scientific director, and Jin, an assistant professor.

On February 25, 2020, approximately seven months after plaintiffs' start date of July 15, 2019, defendant updated its "Faculty Handbook" (Handbook) to include an arbitration agreement, the contents of which will be described below. The Handbook was emailed to all employees, including plaintiffs. Defendant did not require employees to sign the acknowledgment form provided in the Handbook, and it is undisputed that plaintiffs did not sign that form.

On or around April 13, 2021, defendant terminated plaintiffs' employment.

**The Proceedings Below**

On July 29, 2021, plaintiffs filed a complaint against defendant for breach of contract, alleging it "1) fail[ed] to pay 3 out of 5 years salary under the contract; 2) fail[ed] to pay 3 out of 5 years benefits under the contract; 3) fail[ed] to pay for housing and research expenses for 3 out of 5 years; 4) caus[ed] plaintiffs' loss of academic affiliation, preventing them from participating as academics in the field; and 5) fail[ed] to allow for transition time as promised." The complaint identified the plaintiffs' April 1, 2019 employment contract as the contract at issue and attached it as an exhibit.

On October 29, defendant filed an answer to the complaint, asserting 19 affirmative defenses, the last of which alleged that plaintiffs' claims were "barred . . . because there exists and [*sic*] arbitration agreement between

2

Plaintiffs and Defendant . . . ."

On that same day, defendant filed a cross-complaint against plaintiffs captioned, "CROSS-COMPLAINT FOR DAMAGES [SUBJECT TO ARBITRATION]." The cross-complaint alleged two causes of action for breach of written contract and breach of the implied covenant of good faith and fair dealing. In the introduction of the cross-complaint, defendant stated that plaintiffs had "filed their initial Complaint . . . despite the claim being subject to an arbitration agreement."

On November 10, defendant served plaintiffs with discovery demands.

On November 29, plaintiffs filed an answer to the cross-complaint.

On December 20, defendant filed a motion to compel arbitration and to stay proceedings. The motion was accompanied by a memorandum of points and authorities and the declarations of its attorney, Alan Levins, and its Vice President, Danielle Herrerias. Defendant argued that, as a threshold matter, any challenges from plaintiffs to the arbitrability or enforceability of the arbitration provision had to be submitted to an arbitrator, and substantively, the arbitration agreement was valid and covered plaintiffs' claims. Defendant admitted that plaintiffs never signed the Handbook that contained the arbitration provision. Defendant, however, argued plaintiffs impliedly accepted the arbitration provision by continuing their employment with defendant after receiving the Handbook, and by relying on the Handbook as a basis for their breach of contract claims.

In her declaration, Herrerias stated that on February 25, 2020, defendant had updated its Faculty Handbook to include an arbitration provision and emailed the handbook to all faculty members, including plaintiffs. Herrerias also stated that "[f]aculty members were not required to sign an acknowledgment of the Handbook, but it applied to and governed the

3

terms of all faculty members' employment, including Plaintiffs."

The Handbook, which was attached to Herrerias's declaration, is 16 pages long. The arbitration provision appears on pages 11 and 12 under the heading, "SUSPENSION, TERMINATION, & APPEAL," and its sub-heading, "Appeal Process." It states in full:

"To the fullest extent allowed by law, any controversy, claim or dispute between the Faculty Member and the Buck Institute (and/or any of its trustees, directors, officers, employees, volunteers or agents) relating to or arising out of the Faculty Member's employment or the cessation of that employment, will be submitted to final and binding arbitration in Marin County, California, for determination in accordance with the American Arbitration Association's ('AAA') National Rules for the Resolution of Employment Disputes, as the exclusive remedy for such controversy, claim or dispute.

"In any such arbitration, the parties may conduct discovery to the same extent as would be permitted in a court of law. The arbitrator shall issue a written decision, and shall have full authority to award all remedies, which would have been available in court. The Buck Institute shall pay the arbitrator's fees and any AAA administrative expenses. Any judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction there over.

"Possible disputes covered by the above include (but are not limited to) unpaid wages, breach of contract, torts, violation of public policy, discrimination, or any other employment-related claims, including, but not limited to, Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the California Labor Code, and any other

4

statutes or laws relating to an employee's relationship with their employer. However, claims for workers' compensation benefits and unemployment insurance (or any other claims where mandatory arbitration is prohibited by law) are not covered by this arbitration agreement, and such claims may be presented by the Faculty Member to the appropriate court or government agency. BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH FACULTY MEMBER AND THE BUCK INSTITUTE GIVE UP ALL RIGHTS TO TRIAL BY JURY."

In the three pages immediately following, the Handbook provides a "Self-Evaluation Supplement" to be filled out by junior faculty members for their annual reviews.

Finally, the page after that is an acknowledgment form entitled "RECEIPT FOR FACULTY HANDBOOK," which provides a signature line for faculty members. The form states, in part, "I have received my copy of the Buck Faculty Handbook. I understand and agree that it is my responsibility to read and familiarize myself with the policies and procedures contained herein." It is undisputed that plaintiffs did not sign this form.

In the declaration of defense counsel Levins, he states that plaintiffs' counsel had called him approximately two months earlier to discuss the Handbook and "claimed that the Buck Institute's alleged failure to comply with the one-year transition period set forth in the Handbook was one of the bases for Plaintiffs' breach of contract allegations." Levins also averred that one month earlier, his office had asked plaintiffs to stipulate to arbitration pursuant to the arbitration agreement in the Handbook. After continued meet and confer efforts, plaintiffs refused to do so.

Finally, Levins's declaration provided a website link to, and attached a copy of, the AAA's "Employment Arbitration Rules and Mediation

5

Procedures." One of the rules states, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Levins's declaration does not state, and there is nothing in the record to indicate, that a copy of the AAA rules was sent to plaintiffs.

On February 1, 2022, plaintiffs filed their opposition to the motion. They argued there was no valid arbitration agreement because they did not sign an arbitration agreement when they were hired or the Handbook later updated to include the arbitration provision. Alternatively, plaintiffs asserted that the arbitration agreement was unconscionable, and that defendant waived any right to compel arbitration by delaying in bringing the motion and acting inconsistently with an intent to arbitrate.

Accompanying the opposition was the declaration of plaintiffs' counsel, who attached a copy of plaintiffs' April 1, 2019 employment contract. In support of plaintiffs' waiver argument, counsel summarized defendant's litigation conduct in the lawsuit thus far: it filed an answer to the complaint, filed a cross-complaint against plaintiffs for damages, served discovery demands, and attended a case management conference.

On February 7, defendant filed its reply to the opposition, along with another declaration of Herrerias. Herrerias stated that at the time of plaintiffs' onboarding, they were presented copies of an employee handbook and signed the form acknowledging they received that handbook. Herrerias attached the plaintiffs' signed forms, but not the handbook. There is no evidence that this version of the handbook contained an arbitration provision.

On February 15, the court held a hearing on the motion to compel arbitration, prior to which it issued a tentative ruling denying the motion and stay request. Defendant contested, and argument was held. During that

6

argument, the court commented, "I mean I just have to say, because I get these disputes all the time, I mean normally the employer goes to great lengths to highlight the arbitration provision because they're aware of rather a multitude of cases that say you've got to make a specific finding that the parties waived their rights to other judicial remedies and agree to arbitration. I mean unless I'm missing something, the provisions here were kind of placed right in the back of the handbook. They weren't . . . particularly visible. No separate notice was sent to employees, by the way, you need to check your handbook, because we have a new, we're changing our approach, and all of you, if you want to work here, you have to agree to arbitration. There was none of that, right?" The court also observed, "There's no paperwork where a party signed. . . . [¶] Here there's just a change of policy well after they've been working there that prescribes arbitration . . . ." The matter was then submitted.

On March 2, the court entered its written order, which adopted and incorporated by reference the tentative ruling denying the motion. In that ruling, the court rejected defendant's assertion that the parties delegated the issue of whether the parties agreed to arbitrate to the arbitrator. Citing several cases, the court held, "Whether the parties entered into an agreement to arbitrate is for the court to decide, even where an agreement includes a delegation clause or reference to AAA rules."

Turning to whether the parties agreed to arbitrate, the court began by stating the applicable law: " 'An essential element of any contract is the consent of the parties, or mutual assent, which must be communicated by each party to the other. Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their

7

unexpressed intentions or understandings.' (*Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 787 [(*Esparza*)] [citations and internal quotations omitted].) Generally, an arbitration agreement must be memorialized in writing. A party's acceptance of an agreement to arbitrate may be express, such as where he or she signs the agreement, or may be implied in fact. (*Marenco v. DirecTV LLC* (2015) 233 Cal.App.4th 1409, 1417.)"

The court pointed to the undisputed evidence that plaintiffs did not sign any arbitration agreement at the time they were hired; the Handbook was later updated to include an arbitration policy; and plaintiffs did not sign the form acknowledging receipt of the Handbook. Based on this evidence, the court found there was no written acceptance of the arbitration provision.

The court then addressed defendant's argument "that Plaintiffs' agreement [to arbitrate] was implied because Plaintiffs continued their employment after receiving the updated handbook." It examined the cases cited by defendant—*Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416 (*Craig*); *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373 (*Harris*); and *Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126 (*Diaz*)—and found they were distinguishable on their facts.

Accordingly, the court held, "[defendant] has failed to meet its burden of showing an agreement to arbitrate and therefore its motion to compel arbitration is denied. Because the motion is denied on this basis, the Court does not address the parties' additional arguments regarding unconscionability and waiver."

This appeal followed.

## DISCUSSION

### The Law and the Standard of Review

Code of Civil Procedure section 1281.2 requires the superior court to

8

order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy . . . if it determines that an agreement to arbitrate the controversy exists." "As the language of this section makes plain, the threshold question presented by every petition to compel arbitration is whether an agreement to arbitrate exists." (*Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1120 (*Trinity*), citing *American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228, 233 [it is an " 'overarching principle that arbitration is a matter of contract' "]; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*) [" ' " 'a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit' " ' "].)

The party moving to compel arbitration has the burden to prove the existence of a valid agreement to arbitrate. (*Pinnacle, supra*, 55 Cal.4th at p. 236.) In the words of our Supreme Court, "The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.] . . . [T]he trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence . . . to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; accord, *Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 842.)

And we review the matter in light of the applicable standard of review, which we have described this way: "There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.]

9

If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed. [Citations.]" (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425; accord, *Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 630.)

### The Trial Court Had Authority to Determine Whether the Parties Agreed to Arbitrate

As recited above, the arbitration provision in the Handbook states that "any controversy, claim or dispute between the Faculty Member and the Buck Institute . . . relating to or arising out of the Faculty Member's employment or the cessation of that employment, will be submitted to final and binding arbitration . . . for determination in accordance with the American Arbitration Association's ('AAA') National Rules for the Resolution of Employment Disputes." And those rules state, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Based on this language, defendant argues that the trial court had no authority to determine whether plaintiffs agreed to the arbitration provision in the Handbook. Rather, defendant argues, any dispute regarding whether an agreement to arbitrate exists should have been decided by the arbitrator.

Last year, the Second District in *Trinity* rejected a similar argument. (*Trinity*, *supra*, 78 Cal.App.5th at pp. 1121–1123.) We find its reasoning persuasive and apply it here to conclude that the trial court did not err in deciding the threshold issue of whether an arbitration agreement existed.

*Trinity* first explained that as a general matter, " 'parties may agree to have an arbitrator decide not only the merits of a particular dispute but also

10

" 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." ' (*Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. ___ [139 S.Ct. 524, 529] (*Henry Schein, Inc.*); accord, *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68–69; *Banc of California, National Assn. v. Superior Court* (2021) 69 Cal.App.5th 357, 366–367.)" (*Trinity, supra*, 78 Cal.App.5th at p. 1122.) "Accordingly, 'when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator[,] . . . [those] delegation clauses are generally enforceable according to their terms.' . . ." (*Trinity*, at p. 1122, citing *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.5th 1096, 1108; *AT&T Technologies v. Communications Workers of America* (1986) 475 U.S. 643, 649; *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 766.)

*Trinity* continued: "Notwithstanding a provision that clearly and unmistakably delegates arbitrability issues to the arbitrator, if a party 'is claiming that it never agreed to the arbitration clause at all . . . [,] then the court must consider that claim.' (*Bruni v. Didion* [(2008)] 160 Cal.App.4th [1272,] 1287[, citing *Discover Bank v. Superior Court* (2005) 36 Cal.4th 138, 171, overruled on other grounds in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 346–352]; accord, *Mendoza v. Trans Valley Transport, supra*, 75 Cal.App.5th at p. 774 ['despite the existence of a broadly worded delegation clause such as that before us, courts have held that certain gateway issues are for a court to decide, including whether the parties entered into an agreement to arbitrate at all']; *Najarro v. Superior Court* (2021) 70 Cal.App.5th 871, 879 ['we must enforce the delegation clause unless we conclude that no agreement between the contracting parties ever existed

11

due to a lack of mutual assent']; see also *Banc of California, National Assn. v. Superior Court*, *supra*, 69 Cal.App.5th at p. 366, fn. 4 ['under either the [Federal Arbitration Act] or the [California Arbitration Act], it was for the trial court in the first instance to decide whether the parties agreed to arbitrate their dispute']; *Ahlstrom v. DHI Mortgage Company, Ltd., L.P.* (9th Cir. 2021) 21 F.4th 631, 635 ['[Defendant] argues that, like issues of validity and arbitrability, parties may also agree to delegate issues of formation to an arbitrator. We do not agree. [Citations.] . . . As the Supreme Court has recognized, a court should order arbitration only if it is convinced an agreement has been formed']; *Williams v. Medley Opportunity Fund II, LP* (3rd Cir. 2020) 965 F.3d 229, 237, fn. 7 [rejecting defendants' contention that *Henry Schein*, *supra*, 538 U.S. ___ [139 S.Ct. 524] 'establishes a categorical rule that, when an agreement includes a delegation clause, "a court possesses no power to decide the arbitrability issue." . . . *Henry Schein* "did not change . . . the rule that courts must first decide whether an arbitration agreement exists at all" '].)" (*Trinity*, *supra*, 78 Cal.App.5th at pp. 1122–1123.)

This approach, *Trinity* explained, "is consistent with the principle that arbitration is a matter of contract—a party cannot be compelled to arbitrate pursuant to a contract to which the party never agreed." (*Trinity*, *supra*, 78 Cal.App.5th at p. 1123; citing *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 252 (*Sandquist*), overruled on other grounds in *Lamps Plus. Inc. v. Varela* (2019) 587 U.S. ___, 139 S.Ct. 1407, 1413–1419; see *Bruni v. Didion*, *supra*, 160 Cal.App.4th at p. 1291 [when a party asserts it never agreed to arbitration provisions, it "cannot be required to arbitrate *anything*—not even arbitrability—until a court has made a threshold determination that [it] did, in fact, agree to arbitrate *something*"].)

12

Furthermore, "[t]o presume arbitrability without first establishing, independently, consent to arbitration is to place the proverbial cart before the horse." (*Sandquist, supra,* 1 Cal.5th at p. 252; see *id.* at p. 254 ["One such logical condition precedent is whether, in fact, the parties agreed to arbitrate at all; it makes no sense to compel parties to go before an arbitrator without first determining they agreed to do so"].)

Applying the principles set forth in *Trinity* and the authorities it cites, even assuming that the arbitration agreement here clearly and unmistakenly purported to delegate issues concerning its formation to an arbitrator,[1] the trial court did not err in deciding whether the parties entered into an arbitration agreement rather than requiring them to arbitrate the issue. A contrary conclusion would necessarily rely on circular logic: because plaintiffs had consented to the delegation clause, they were compelled to arbitrate their claim that they had *not* consented to that very clause. Not only that, such a conclusion—compelling arbitration before any finding of consent to arbitration—would also violate the principle that arbitration is strictly a matter of consent. (See *Sandquist, supra,* 1 Cal.5th at 252; *Trinity, supra,* 78 Cal.App.5th at p. 1123.)

We turn now to whether the trial court erred when it found that the parties had not entered into an agreement to arbitrate.

---

[1] An issue we need not decide. (But see *Gostev v. Skillz Platform, Inc.* (Feb. 28, 2023, A164407) ___ Cal.App.5th ___ [2023 Cal.App. Lexis 139] [holding that a consumer arbitration agreement did not clearly and unmistakably delegate to the arbitrator the question of unconscionability, because such threshold question was not expressly delegated, and mere reference to AAA rules empowering arbitrator to rule on jurisdiction was insufficient to prove the consumer, an unsophisticated party, considered and consciously agreed to delegate the issue].)

**The Evidence Did Not Compel a Finding that Plaintiffs Agreed to Arbitrate**

The strong public policy favoring contractual arbitration does not extend to parties who have not agreed to arbitrate. (*Esparza, supra,* 2 Cal.App.5th at p. 787.) "In California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' [Citations.]" (*Pinnacle, supra,* 55 Cal.4th at p. 236.)

The existence of a contract requires parties capable of contracting, their consent, a lawful object, and a sufficient cause or consideration. (Civ. Code, § 1550.) At issue here is the "element of . . . the consent of the parties, or mutual assent." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270; Civ. Code, §§ 1550, subd. 2, 1565, subd. 3.) " '[T]he consent of the parties to a contract must be communicated by each party to the other. [Citation.] "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." [Citations.]' [Citation.]" (*Esparza, supra,* 2 Cal.App.5th at p. 788.)

"Generally, an arbitration agreement must be memorialized in writing. [Citation.] A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact. [Citation.]" (*Pinnacle, supra,* 55 Cal.4th at p. 236.)

"An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) " 'Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an *intent to promise*."

14

[Citation.]' [Citations.]" (*Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1010, italics added.) "Accordingly, a contract implied in fact 'consists of obligations arising from *a mutual agreement and intent to promise* where the agreement and promise have not been expressed in words.' [Citation.]" (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178, italics added.)

The issue here is whether the Handbook created a mutual agreement to arbitrate. The trial court concluded defendant failed to meet its burden of establishing plaintiffs accepted an agreement to arbitrate, either expressly or impliedly. Defendant contends the court committed "reversible error" in reaching its conclusion. We disagree.

At the outset, defendant makes a threshold argument that "[t]o satisfy its initial burden of establishing the existence of an arbitration agreement, [it] need only submit a copy of it," which it did in this case. Defendant relies on *Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, but it has no bearing on this case. The issue in *Espejo* was one of authentication—whether an employee's signature on an electronically completed agreement covering dispute resolution was sufficiently authenticated. (*Id.* at p. 1062.) The court found that the employer met its initial burden of proving the existence of an arbitration agreement by attaching to the petition a copy of the purported arbitration agreement bearing the employee's electronic signature; once the employee challenged the validity of that signature in his opposition, the employer was required to establish the signature was authentic. (*Id.* at p. 1060.) *Espejo* is simply inapplicable here, where it is undisputed that plaintiffs never signed any agreement to arbitrate.

Next, defendant argues that all of the elements required to form an

15

agreement to arbitrate were met in this case. As we shall explain, because the element of mutual assent is dispositive, we need not discuss defendant's arguments concerning the elements of a contract besides mutual assent—the parties' capability of contracting, a lawful objective, and a sufficient cause or consideration (Civ. Code, § 1550).

On the element of mutual assent, defendant reasserts its argument below that although it "does not dispute that [plaintiffs] did not sign the Arbitration Agreement," plaintiffs "received the Arbitration Agreement during the course of their employment and impliedly accepted the Agreement when they continued their employment without objection." Defendant then states, "Courts have upheld unsigned arbitration agreements where the employee's acceptance of the agreement is implied," before citing *Craig*, *supra*, 84 Cal.App.4th 416, *Harris*, *supra*, 248 Cal.App.4th 373, and *Davis v. Nordstrom* (9th Cir. 2014) 755 F.3d 1089 (*Davis*). Defendant then includes a string citation to *Diaz, supra*, 34 Cal.App.5th 126 and *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1 (*Asmus*).

Defendant recites the holdings of the above cases but makes no meaningful effort to explain how they apply to the facts before us—let alone demonstrate that the trial court erred in finding that most of those cases do *not* apply. "[C]iting cases without any discussion of their application to the present case results in forfeiture. [Citations.] We are not required to examine undeveloped claims or to supply arguments for the litigants. [Citations.]" (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) In any event, we conclude, just like the trial court, that the cited cases do not

16

assist defendant's position.[2]

In *Craig*, after the employee had worked for the employer for 12 years, the employer established a dispute resolution program that required all disputes arising out of the employment to be submitted to binding arbitration. (*Craig*, *supra*, 84 Cal.App.4th at pp. 418–419.) In a memorandum sent to its employees, the employer enclosed a brochure and stated: "The enclosed brochure explains the procedures as well as how the Dispute Resolution Program works as a whole. . . . IT APPLIES TO YOU. It will govern all future legal disputes between you and the Company that are related in any way to your employment." (*Id*. at p. 419.) The appellate court rejected the employee's assertion the evidence was insufficient to prove she entered into an arbitration agreement with her employer. (*Id*. at p. 420.) The court determined there was substantial evidence that the employer twice mailed the employee the memorandum and the brochure, that she continued to work for the employer afterwards, and that "she thereby agreed to be bound by the terms of the Dispute Resolution Program, including its provision for binding arbitration." (*Id*. at p. 422.)

We agree with the trial court that *Craig* is distinguishable. In *Craig*, the memorandum simply informed employees that any employment-related dispute would henceforth be subject to arbitration. Here, in contrast, the language of the arbitration provision in the Handbook—"BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH FACULTY MEMBER AND THE BUCK INSTITUTE GIVE UP ALL RIGHTS TO TRIAL BY JURY"—contemplates that the arbitration provision would be effective only if

---

[2] Defendant's reply brief includes additional cases on the issue, but as explained below, they are also inapposite.

both the faculty member and defendant assented to it. (Cf. *Marcus & Millichap Real Estate Inv. Brokerage Co. v. Hock Inv. Co.* (1998) 68 Cal.App.4th 83, 91 [purchase agreement stating that if controversy arises with respect to the subject matter of the agreement, " '*Buyer, Seller and Agent agree* that such controversy shall be settled by final, binding arbitration' . . . clearly contemplates that *all* parties must agree to the clause in order for it to be effective"].) Additionally, there is no evidence that defendant, like the employer in *Craig*, specifically alerted plaintiffs to the arbitration provision, much less make clear to them that they were bound to it. Rather, plaintiffs simply received a copy of the Handbook with no mention of the arbitration provision, which, as the trial court observed, is "found towards the end of the handbook without any heading or other language highlighting the existence of an arbitration provision and under a heading for an 'Appeal Process' . . . ."

 *Harris* is also inapt. In that case, the employee acknowledged, in writing, receipt of both an arbitration agreement and an employee handbook containing the arbitration provision. (*Harris*, *supra*, 248 Cal.App.4th at pp. 377–379, 381.) The arbitration agreement stated: " 'If Employee voluntarily continues his/her employment . . . after the effective date of this Policy, Employee will be deemed to have knowingly and voluntarily consented to and accepted all of the terms and conditions set forth herein without exception.' " (*Id.* at pp. 379, 381.) Moreover, the handbook provided, " 'If for any reason, an applicant fails to execute the Agreement to Arbitrate yet begins employment, that employee will be deemed to have consented to the Agreement to Arbitrate by virtue of receipt of this Handbook.' " (*Ibid.*) Based on the uncontroverted language in the employee handbook and the arbitration agreement, *Harris* held that the employee consented to arbitrate

18

his claims when he began working for the employer.  (*Id*. at p. 381.)

Here, unlike in *Harris,* plaintiffs did not sign the form acknowledging receipt of the Handbook containing the arbitration provision.  Also, nothing in the Handbook provides any language stating that continued employment by any faculty member who refused to sign the acknowledgment form would itself constitute acceptance of the agreement.

Defendant's reliance on federal case *Davis* is also misplaced.  There, the employee acknowledged that she had received a copy of an employee handbook when she first took her position at Nordstrom.  (*Davis, supra,* 755 F.3d at p. 1092.)  The handbook contained an arbitration clause, as well as a provision that required Nordstrom to provide employees with notice of any substantive changes to the arbitration clause.  (*Ibid.*)  That "notice provision was included to 'allow employees time to consider the changes and decide whether or not to continue employment subject to the changes.' " (*Ibid.*)  The Ninth Circuit held that because "[t]he handbook [the employee] received when she began work established the ground rules of her employment, including that [she] and Nordstrom would arbitrate certain disputes[,] [s]he accepted employment on this basis, so there was a binding agreement to arbitrate."  (*Id*. at p. 1093.)

Here, in contrast, as we have already explained, there is no evidence that the "ground rules" of plaintiffs' employment when they began working for defendant required that the parties would arbitrate certain disputes.  And even after defendant later updated the Handbook to include an arbitration provision, it gave no separate notice to plaintiffs that they should consider whether to continue employment in light of the changes.

Following defendant's summary of *Davis* is a string citation to *Diaz* and *Asmus*, discussion of which is even more perfunctory than the above cited

19

cases. Regardless, as the trial court here found, *Diaz* is inapposite, explaining, "In *Diaz* . . . , the plaintiff attended a meeting at which she was given a copy of the company's dispute resolution policy requiring arbitration of all claims, and was told that continued employment by anyone who refused to sign would itself constitute acceptance of the agreement. No similar facts exist here." (*Diaz, supra*, 34 Cal.App.5th at pp. 128, 130.)

Likewise, *Asmus* does not assist defendant. As described by one court, "Significantly, . . . *Asmus* . . . [did not] address[ ] whether an arbitration agreement existed between an employer and employee." (*Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1171.) Rather, "*Asmus, supra*, 23 Cal.4th 1, arose in the context of an employer's discontinuance of a management employment security policy but did not involve an arbitration agreement." (*Mitri v. Arnel Management Co., supra,* 157 Cal.App.4th at p. 1171.) Further, although the Supreme Court in *Asmus* recognized that " 'California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment,' " it did "not further explore the issue in the context [t]here." (*Asmus*, at p. 11.) In fact, both parties in *Asmus* agreed that the employees had accepted a unilateral contract by their performance. (*Ibid*.) Thus, the question in *Asmus* was how the unilateral contract, once formed, could then be modified or terminated by the employer. (*Ibid*.) Another distinguishing factor from *Asmus* is that the issue in this case, as framed by defendant's motion to compel arbitration, is whether the Handbook showed a *bilateral* contract to arbitrate. As explained above, the language of the arbitration agreement contemplates mutuality of obligation, in that both parties must agree to it in order for it to be effective.

The other authorities in defendant's reply brief are also of no help to it.

20

Those cases involved starkly different facts or legal issues. (See, e.g., *Serafin v. Balco Properties, Ltd., LLC* (2015) 235 Cal.App.4th 165, 174–177, [enforcing arbitration agreement signed by the employee, but not the employer, partly on the grounds that employer's assent to the policy was established by virtue of its drafting the policy and conveying it to the employee]; *Marenco v. DirecTV LLC* (2015) 233 Cal.App.4th 1409, 1417 [addressing "whether a nonsignatory defendant may enforce an arbitration agreement between a signatory plaintiff and a corporation that was acquired by the nonsignatory defendant, which assumed all the rights and obligations of the acquired corporation"]; *Saline v. Northrop Grumman Corp.* (C.D. Cal., Feb. 9, 2009, Case No. CV08-08398 MMM (Ex)) 2009 U.S. Dist. Lexis 138960, 4 [finding employee accepted an arbitration policy the employer had implemented after employee was hired, where employer sent multiple emails to employees that expressly referred to the new arbitration process, gave them an opportunity to opt out of the process, and informed them that by continuing employment, they agreed to binding arbitration].)

Accordingly, the cases cited by defendant do not support its argument that plaintiffs agreed to arbitrate their claims. Indeed, as the trial court found, case law based on facts similar to this case, but not cited by defendant, supports the opposite conclusion. For example, the trial court cited *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771 (*Ajamian*). There, the employer relied on *Craig* to argue that the employee's continued employment after receipt of policies in a handbook with an arbitration clause constituted acceptance of the arbitration provision. (*Ajamian, supra*, 203 Cal.App.4th at p. 806.) The appellate court rejected that argument. (*Ibid.*) Here, as in *Ajamian*, the employee was never sent a notice that emphasized that employees were bound by the arbitration provision, the employee did not

sign or agree to the actual agreement in the handbook or the handbook containing the arbitration provision, and the section containing the arbitration provision generically referred to "policies," not to arbitration. (*Id.* at pp. 805–806.)

On the issue of mutual assent, defendant also raises this argument: "Jin and Lei further demonstrated their acceptance of the Arbitration Agreement when they called the Faculty Handbook containing the Agreement to the Buck Institute's attention to support their contention that the Buck Institute failed to comply with the one-year transition period set forth in the Handbook." Defendant fails to explain this argument with reasoned analysis beyond the one sentence just quoted or to support it with legal authority. This is improper.

Defendant as the appellant has the burden "to present *argument and legal authority* on *each point* raised. This requires more than simply stating a bare assertion that the judgment, or part of it, is erroneous and leaving it to the appellate court to figure out why; it is not the appellate court's role to construct theories or arguments that would undermine the judgment and defeat the presumption of correctness." (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Guide 2022) ¶ 8:17.1, citing *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721; *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.) Defendant's failure to support its assertion with cogent argument and citations to authority forfeits the argument and allows us to disregard it. (See Eisenberg, *supra*, ¶ 8:17.1, citing *People v. Stanley* (1995) 10 Cal.4th 764, 793; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075; *Salas v. California Dept. of Transp.* (2011) 198 Cal.App.4th 1058, 1074.)

Forfeiture aside, the argument is unavailing. The trial court did not

address the argument, but its silence is dealt with the presumtion of correctness, a fundamental principle of appellate procedure. Under that presumption, we must indulge all intendments and presumptions that support the court's order. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Thus, when an order is silent on a matter, the reviewing court presumes the trial court decided the matter in a way that supports the order. (*Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.) Applying the presumption here, we conclude the trial court considered and impliedly rejected the argument raised by defendant.

This implied finding is supported by the record. In arguing that plaintiffs should be bound by the arbitration provision in the Handbook because they relied on other provisions in that same Handbook to support their breach of contract claim, defendant only cites evidence favorable to it: the declaration of its trial attorney, who stated that plaintiffs' counsel had told him that plaintiffs' breach of contract claims were based on a provision of the Handbook. Defendant, however, neglects to mention that its attorney's declaration also attaches an email from plaintiffs' counsel disavowing such characterizations. Specifically, plaintiffs' counsel wrote that the references to the Handbook were "regarding Ms. Lei's NIH grant which is unrelated to the contract claims." Given that the evidence on the issue is in conflict, the substantial evidence standard applies, which standard requires us to "presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence." (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923; accord, *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.) As such, we presume the court resolved the conflict in the evidence in plaintiffs' favor and defer to its resolution of that evidence.

23

Thus, the premise of defendant's argument that plaintiffs relied on the Handbook to support their breach of contract claims fails.

In sum, the evidence was insufficient to meet defendant's burden to demonstrate the existence of an arbitration agreement. The trial court did not err in denying defendant's motion to compel arbitration.[3]

## DISPOSITION

The order denying the motion to compel arbitration is affirmed. Plaintiffs shall recover their costs on appeal.

---

[3] In light of the conclusion we reach, we need not discuss plaintiffs' alternative arguments that (1) the arbitration agreement was unconscionable and thus unenforceable, and (2) defendant waived any right to compel arbitration due to its delay and conduct inconsistent with an intent to arbitrate.

_____
Richman, J.


We concur:


_____
Stewart, P.J.


_____
Markman, J. *


*Jin v. Buck Institute for Research on Aging* (A164941)

 *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.